**Affidavit Of Special Agent Kristin Rosenbeck**

I, Kristin Rosenbeck, on oath depose and state that:

1.      I am a Special Agent with U.S. Immigration and Customs Enforcement ("ICE"),

and I have been employed with ICE and its predecessor agency, U.S. Customs Service, since June

1991. I am currently assigned to the Drug Smuggling Group of the Boston Office. Prior to this

position, I was assigned to the money laundering group in Boston. Prior to that, I served for five

years as a Special Agent in Brownsville, Texas working on drug smuggling investigations. Since

joining federal law enforcement in 1991, I have been involved in multiple drug-related

investigations involving the illegal smuggling of cocaine, heroin, marijuana, and other controlled

substances. I have received extensive training in all aspects of drug smuggling and the techniques

used by persons to finance and import drugs.

2.      I make this affidavit based upon personal knowledge derived from my participation

in this investigation and upon information provided to me by other federal and local law

enforcement officers.

3.      This Affidavit is submitted in support of a criminal complaint charging FELIX

PARRA-GASTELOM and JOSE LUIS ARELLANO with conspiracy to distribute, and to possess

with intent to distribute, marijuana in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1). This

investigation is still ongoing. Accordingly, I have not included each and every fact known to me

and to other agents working in this investigation. Instead, I have included only those facts which I

believe are necessary to establish the existence of probable cause to support the issuance of the

criminal complaint.

## FACTS

4.      In October 2004, Special Agents assigned to ICE in Laredo, Texas, received

information that a marijuana distributor was looking for assistance in transporting a load of marijuana from Texas to Boston, MA. They learned that the distributor wanted a tractor-trailer driver fluent in both English and Spanish languages and that the distributor would meet the load in Boston, MA.

5.    On October 18, 2004, surveillance agents arranged for the distributor to be identified through a traffic stop. The distributor was stopped while driving a pickup truck recognized by surveillance agents, and the distributor produced a border crossing card identifying himself as Felix PARRA-GASTELOM (hereafter "PARRA"). However, a subsequent search of the Immigration and Naturalization Service Central Index System, which contains data on all individuals possessing border crossing cards, did not return data for this name.

6.    On October 20, 2004, law enforcement agent(s) acting in an undercover capacity, hereinafter referred to as UCA, met with an associate of PARRA, Jose Luis ARELLANO, to discuss the logistics of transporting a large amount of smuggled marijuana. A photograph of ARELLANO obtained from his driver's license, and recognized by agents to be a photograph of the person attending this meeting, is attached as Exhibit 1. The UCA met with ARELLANO and PARRA on October 25, 2004 and again on November 2, 2004. These meetings took place in Spanish and were recorded with audio equipment.

7.    During the October 25, 2004 meeting, PARRA reported to the UCA, in sum and substance, that they are constantly moving stuff. He noted that the marijuana is very professionally packaged. He stated that there is no way to detect it, and that it does not smell. He indicated that he uses a cover load to hide the true nature of the delivery. PARRA reported that he usually deals in loads of 1000 to 1500 pounds. PARRA and the UCA discussed a price of $50,000

2

for the transportation.  PARRA agreed to pay $10,000 before the pickup and the remainder at the time of delivery.

8.       On November 2, 2004, UCA met with ARELLANO and PARRA to discuss and finalize the marijuana transportation.  The Spanish language conversation was recorded on video and audio.  Images of PARRA taken from this video are attached as Exhibits 2, 3, 4 and 5 to this Affidavit.  During this meeting, PARRA gave directions from Texas to Boston and described in detail the hotel location near Boston (a TAGE INN) where the UCA were to meet with PARRA. PARRA indicated that the UCA would go to the drop off location from there.  PARRA stated, in substance, that he would make arrangements with ARELLANO to pick up the load on the following day (November 3).  PARRA told the UCA to drop off the container and then come back for it after the load was placed inside.  ARELLANO told the UCA in substance to drop off the trailer around 4:00 - 4:30 pm the next day and come back around 7:00 a.m. on the following next day (November 4) for pick up.  PARRA stated in substance that he might have the $40,000 ready once the UCA arrived in Boston, and that the UCA should call PARRA's cellular telephone once they arrived at the Boston area hotel.

9.       During this conversation, PARRA further explained that he would not come close to the load or the restaurant location, but he will leave an individual that will bring the UCA to the drop off location.  ARELLANO told the UCA, in substance, that he would wait for the call from the UCA when he arrived to pick up the container.

10.      On November 3, 2004, UCA dropped off a trailer to a warehouse located at 1710 Markley Lane, Laredo, TX.  ARELLANO indicated to the UCA that he controlled this warehouse. Discussions among the UCA and ARELLANO took place in Spanish and were recorded on video

3

and audio. In substance, the UCA met with ARELLANO to pick up the container. ARELLANO told the UCA that the truck was ready and that he would give the UCA a call around 7:00 p.m. - 7:30pm.

11.     On November 4, 2004, UCA met with ARELLANO and PARRA at the warehouse location. At this meeting, PARRA gave $10,000 in U.S. currency to the UCA. This conversation was recorded on video and audio. Images of PARRA and ARELLANO from this video are attached as Exhibits 6 and 7, respectively.

12.     On November 5, 2004, UCA picked up the trailer loaded with marijuana from the warehouse for transport to the Boston, MA, area. When the UCA arrived at the warehouse location, the trailer was partially loaded with the cover load. ARELLANO operated a forklift to load the boxes containing the smuggled marijuana and continued to fill the trailer with the cover load.

13.     On November 7, 2004, the UCA arrived in the Boston, MA, area. Law enforcement officers in Boston outfitted the tractor-trailer with a GPS transponder. The next day, on November 8, 2004, the UCA, who were outfitted with an audio and visual transmitter allowing real-time monitoring and recording, drove the tractor trailer to the TAGE INN, located in Somerville, MA, as previously instructed by PARRA.

14.     On this same date, surveillance units witnessed a subject later identified as William STANLEY exit a black Ford Taurus vehicle displaying license plate MA-US 62DV40. STANLEY departed the front passenger side of the Taurus carrying a small, plastic bag in his hands. STANLEY walked to the rear of the Taurus where he appeared to be manipulating items in the trunk of the Taurus. STANLEY removed a black, plastic trash bag from the trunk. A photo of this

4

activity revealed a box that appears to be a box of Husky brand trash bags. A box of Husky brand contractor bags was later seized.

15.    Surveillance units witnessed STANLEY walk across the street and get into the passenger's side of the cab of the tractor. STANLEY introduced himself to the driver as "Billy". STANLEY directed the driver to take 93 North to 128 South. The Taurus drove by the tractor-trailer and departed the area. UCA identified PARRA as the passenger of the vehicle located in the back, driver's side seat. Upon departing the area, PARRA gave a "thumbs-up" hand signal to the UCA.

16.    STANLEY provided directions to the UCA to go toward the offload location while making and receiving numerous calls on his cellular telephone.

17.    At approximately 11:07 a.m., the tractor-trailer traveled on Esquire Road in Billerica, MA. STANLEY handed over $40,000 from the small plastic bag to the UCA and stated "that's your money."

18.    At approximately 11:14 a.m., STANLEY directed them into the business location, identified as 239 Rangeway Road, Billerica, MA. This location houses a cement block warehouse. STANLEY stated to the UCA that usually the driver leaves the container, the driver takes off and comes back later. STANLEY asked the UCA how the UCA wanted to do it and UCA stated that the UCA would wait for them to finish offloading.

19.    At approximately 11:15 a.m., UCA verified the money in the bag given to the UCA by STANLEY, which appeared to be in bundles of $5,000.

20.    Surveillance units observed the tractor-trailer being unloaded. Several pallets of the cover load, used computer parts, are unloaded onto the ground outside of the warehouse. PARRA had previously instructed UCA in recorded conversations to transport the cover load of used

5

computer parts back to Laredo, TX, for reuse.

21.    At approximately 2:30 p.m., agents observed a maroon Ford F-150 XLT pickup truck, Massachusetts registration number 33RK14, Vehicle Identification Number 1FTRX18L43NB58663, registered to Frederick Pidge, 8 Colonia Road, Billerica, MA, pull into the warehouse. The bed of the pickup truck was empty when the truck arrived but left the warehouse with four Greenlee brand containers in the bed of the truck. The pickup truck was followed, and a search warrant was obtained for the containers, which revealed a total of 76 "bricks" of marijuana, wrapped in cellophane, greased and covered with coffee grounds. This agent is familiar with many methods that drug distributors and couriers use to conceal marijuana and other controlled substances, and it is a common practice to surround controlled substances with coffee in an attempt to conceal the odor. The load field tested positive for marijuana.

22.    Meanwhile, back at the warehouse, a white 1999 Ford Econoline van, Massachusetts Registration number US30RG, Vehicle Identification Number 1FTRE1420XHA06080, registered to Sandra Saunders, pulled in at approximately 3:00 pm, shortly after the pickup truck left. WILLIAM STANLEY met the van at the warehouse, and helped load the van with large trash bags. Surveillance agents saw STANLEY pass the bags to persons inside the van. The bags were opaque, but were observed to be filled to the top, and appeared to be heavy based on the manner in which STANLEY was handling the bags.

23.    The van left the warehouse at approximately 3:15 p.m. Surveillance was maintained, and it was stopped by state police shortly after it left the warehouse. During a subsequent search of the van, fourteen large trash bags were recovered from this vehicle. These bags were full of "bricks" of marijuana, similar in appearance to the bricks recovered from the containers in the pickup truck – tightly wrapped cellophane, greased and covered with coffee

6

grounds. A total of 67 bricks were contained in the trash bags. The load field tested positive for marijuana

24.    After the van departed the warehouse, WILLIAM STANLEY remained outside the warehouse, sitting on a milk crate, making calls on his cellphone. After approximately half an hour sitting outside, STANLEY abandoned his calls and went into the warehouse. STANLEY remained in the warehouse for more than five minutes. When STANLEY did not emerge from the warehouse quickly, agents secured the warehouse, and located the owner of the warehouse, who signed a written consent authorizing a search of the warehouse.

25.    Garbage bags, contractor size, similar in color and size to the bags which WILLIAM STANLEY was seen unloading from the trunk of the Ford Taurus and later loading into the white van, were strewn around the warehouse floor. A partially full box of unused bags was also in the warehouse.

26.    A search of the warehouse revealed five containers similar in size to the green containers seen on the pick up truck. Two of these containers were green, Greenlee brand, identical to the ones on the pickup truck, and three were yellow containers of a "Husky" brand. The yellow containers had locks on them which had coffee grinds on the locks. A search warrant was obtained for the five containers, and upon search, they were found to contain marijuana, packaged in bricks like those located in both the pickup truck and the van. A total of 57 bricks was recovered from the warehouse in these five containers.

27.    The total gross weight of marijuana obtained from the containers in the pickup truck, van, and warehouse was more than fifteen hundred pounds.

## CONCLUSION

28.    Based on the foregoing, I submit that there is probable cause to believe that FELIX

PARRA-GASTELOM and JOSE LUIS ARELLANO knowingly and intentionally conspired to

distribute, and to possess with intent to distribute, marijuana, a Schedule I controlled substance, in

violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1).


Kristin Rosenbeck
Special Agent, Immigration and Customs Enforcement


Sworn to and subscribed before me this 18th day of November 2004.


HON. JOYCE LONDON ALEXANDER
United States Magistrate Judge



Texas Department of Public Safety

# Driver License Image Retrieval System

Logged in as rh09505 - Logout

## SEARCH RESULTS

| DL Number: | 17823729 | |
|---|---|---|
| Name: | ARELLANO,JOSE LUIS | |
| Date of Birth: | 04111955 | |

| Photo: | |
|---|---|
| |  |

| Address: | 1633 DENMARK LANE , LAREDO , TX 780450000 | | |
|---|---|---|---|
| Race: | WHITE | Sex: | M |
| Height: | 511 | Weight: | 210 |
| Eye Color: | BROWN | Hair Color: | BLACK |
| Image Date: | 08262004 | Class: | CLASS C |
| Expiration Date: | 04112007 | Restriction: | A |
| CDL Flag: | | Endorsement: | |

USER ADMIN



EXHIBIT

$l$

PENGAD-Bayonne N.J.



PENGAD-Bayonne N.J.

EXHIBIT

2

PENGAD-Bayonne,N.J

EXHIBIT

3

PENGAD-Bayonne, N.J.

**EXHIBIT**

4

PENGAD-Bayonne,N.J.

EXHIBIT

5





EXHIBIT

6

PENGAD-Bayonne,N.J.



EXHIBIT

7

PENGAD-Bayonne,N.J.